UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ANDREW T. WHITCOMB,

                    Plaintiff,

        v.                                        Case No. 23-cv-385-pp

LAURA SUKOWATY,

                    Defendant.

## ORDER GRANTING DEFENDANT'S UNOPPOSED MOTION FOR SUMMARY JUDGMENT (DKT. NO. 66) AND DISMSSING CASE

Plaintiff Andrew T. Whitcomb, who is incarcerated and is representing himself, filed a complaint under 42 U.S.C. §1983 asserting Eighth Amendment claims against officials at Waupun Correctional Institution. The defendant has filed a motion for summary judgment. Dkt. No. 66. The plaintiff has not responded to the motion, and his time to do so has passed. The court will grant the defendant's unopposed motion and dismiss this case.

## I.    Facts

### A.    Procedural Background

On March 24, 2023, the court received the plaintiff's complaint and motions for a preliminary injunction. Dkt. Nos. 1, 3, 5. The court screened the complaint, allowed the plaintiff to proceed against Dr. Laura Sukowaty regarding allegedly delayed treatment for a hernia, dismissed all other defendants and ordered Sukowaty to answer the complaint and respond to the plaintiff's request for a preliminary injunction. Dkt. No. 9. On September 8, 2023, after the defendant had responded to the plaintiff's request, the court

denied the plaintiff's motion for a preliminary injunction because his medical records showed that he had received the corrective surgery for his hernia that he had requested in his motion. Dkt. No. 32.

On September 11, 2023, the court issued a scheduling order setting deadlines for the parties to complete discovery and file dispositive motions. Dkt. No. 33. After three times requesting an extension of her deadline to file a dispositive motion, dkt. nos. 43, 45, 47, the defendant moved for summary judgment, dkt. no. 49. The court ordered the plaintiff to respond to the motion within thirty days, but he did not do so. Dkt. No. 57. On August 23, 2024, the court denied the summary judgment motion without prejudice because the defendant had violated the court's local rules allowing a party moving for summary judgment to file "'not file more than 150 separately numbered statements of fact.'" Dkt. No. 60 at 2 (quoting Civil Local Rule 56(b)(1)(C)(ii) (E.D. Wis.)). The court also observed that it was not clear whether the plaintiff had received the defendant's summary judgment materials. Id. at 3. The court ordered the defendant to file an amended motion for summary judgment by September 27, 2024, and advised the defendant to "limit her statement of proposed facts to material facts that support her motion." Id.

On September 16, 2024, the defendant filed a motion seeking leave to exceed the 150 limit on proposed facts under Civil Local Rule 56(b)(1)(C)(ii), seeking to refile the same statement of 214 proposed facts that the defendant initially filed with her first motion for summary judgment. Dkt. No. 61. The plaintiff responded to and opposed this motion, suggesting that the defendant was "using this as a way to overload [him] with irrelevant paperwork." Dkt. No.

2

62 at ¶2. The court denied the defendant's motion, finding that the defendant had not explained "why *all* of" the plaintiff's voluminous medical records were "necessary and material to her motion for summary judgment." Dkt. No. 65 at 3. The court ordered the defendant to "file her amended motion for summary judgment and all supporting materials, complying with the court's local rules, by the end of the day on October 18, 2024." Id. at 4 (bolding omitted).

At the October 18, 2024 deadline, the court received the defendant's amended motion for summary judgment and her brief and proposed facts in support. Dkt. Nos. 66–68. But the defendant had not filed any declarations or evidence in support of her motion and proposed facts. The court ordered the defendant to file those missing documents by October 23, 2024 or it would again deny her motion for summary judgment. Dkt. No. 69. The same day, the defendant filed her missing declarations and evidence. Dkt. Nos. 70–74. The court ordered the plaintiff to respond to the defendant's summary judgment motion by the end of the day on November 20, 2024. Dkt. No. 76. The court advised that if it did not receive "either the plaintiff's response to the defendant's motion for summary judgment or an explanation for why he cannot timely file a response" by the November 20, 2024 deadline, "the court will treat the defendant's motion as unopposed, that is, without considering a response from the plaintiff." Id. at 2–3.

The same day that the court ordered the plaintiff to respond to the defendant's motion for summary judgment, the court received the plaintiff's motion "to Dismiss and move Forward on any Defendents Motion For Summery Judgement [*sic*]." Dkt. No. 75. The plaintiff asked the court to dismiss "any

past or future motion" for summary judgment and to proceed to trial because, he asserted, the defendant did not file a motion for summary judgment by the October 18, 2024 deadline. Id. at 1. The court denied the motion because the defendant had filed her summary judgment motion on October 18, and the court had ordered the plaintiff to respond to that motion. Dkt. No. 77.

The November 20, 2024 deadline for the plaintiff's response has passed, and the plaintiff has not filed any materials in response or explained to the court why is unable to do so. The court has not heard from the plaintiff since he filed his October 28, 2024 motion to dismiss. The plaintiff noted in that motion that he still was incarcerated at Waupun. Dkt. No. 75 at 2. The defendant's certificate of service shows that she mailed her summary judgment motion and supporting materials to the plaintiff at Waupun. Dkt. Nos. 66-1, 70-2. The Department of Corrections Offender Locator website shows that he remains incarcerated there. See https://appsdoc.wi.gov/lop/home/home (DOC #480004). The court has no reason to believe that the plaintiff did not receive the defendant's motion and materials or the court's previous order, which was not returned to the court as undeliverable. Nor did the plaintiff inform the court that he did not receive the defendant's materials after the court denied his motion to dismiss. The court will enforce its previous order and consider the defendant's proposed facts to be undisputed and the assertions in the defendant's brief to be unopposed for purposes of this decision.[1]

---

[1] The materials that the defendant filed on October 18, 2024 no more comply with this court's local rules than did the previous materials she filed. She again filed 150 proposed findings of fact, many of which contain multiple factual

B.    Factual Background

    1.    *The Plaintiff's Complaint*

The court summarized the plaintiff's allegations in the screening order:

> The plaintiff alleges that he has a large hernia that is causing him pain, but that Dr. Sukowa[t]y has failed to "give [him] anything to help with the pain." He alleges that on November 7, 2022, Dr. Karen Reynolds, a surgeon at Waupun Memorial Hospital (who is not a defendant), informed the plaintiff that he needed immediate surgery. The plaintiff alleges that Dr. Reynolds's order was sent back to Waupun, but that the defendants have refused to schedule him for surgery to treat his hernia and pain.
>
> The plaintiff alleges that by refusing him the surgery, the defendants have put his life and safety at risk due to possible complications from the hernia. He says he has tried "to kill [him]self due to the amount of pain [he is] in everyday and as a way to escape dealing with it." He alleges that Dr. Sukowa[t]y told him he "did it to [him]self" because of the number of times he has required surgery to remove a foreign body that the plaintiff ingested in an attempt to kill himself. The plaintiff claims that Dr. Sukowa[t]y is "using [his] mental health against [him]." He says Dr. Sukowa[t]y told him that he needs "to go for [two] years with [no] self harm or suicide attempts before they will even consider granting [him] the surgery." The plaintiff asserts that that policy violates his rights and "is unethical and demoralizing along with inhumane."

Dkt. No. 9 at 4–5 (internal citations omitted). The court observed that the plaintiff's allegations and his attached medical notes suggested that he suffered from "a non-reducible, 'strangulated' hernia—'an emergency surgical situation in which the hernia is non-reducible and possibly gangrenous, i.e., causing abdominal tissue decay.'" Id. at 8 (quoting Johnson v. Doughty, 433 F.3d 1001, 1004 (7th Cir. 2006)). The allegations showed that "the defendants are aware of

---

statements. Dkt. No. 68. She again filed hundreds of pages of exhibits, many of which are unnecessary to determine the motion. Dkt. Nos. 70-74. In the future, the court expects counsel to carefully read and comply with the local rules *and* both the letter and the spirit of court orders.

his hernia," and a surgeon recommended that he undergo immediate surgery; but the plaintiff did not receive surgery and remained in severe pain that occasionally led him to harm himself or even attempt to take his life. Id. The court determined that "[t]he complaint and the attached medical records support a claim that Dr. Sukowa[t]y is aware of but has disregarded the plaintiff's serious medical need by refusing him surgery for his hernia." Id. at 9. The court allowed the plaintiff to proceed on an Eighth Amendment claim against Sukowaty. Id. The court dismissed all other defendants because the plaintiff did not allege what any of them "specifically did to disregard his medical needs." Id. at 10.

> 2. *The Defendant's Undisputed Facts*

At all relevant times, the plaintiff was incarcerated at Waupun. Dkt. No. 68 at ¶1. Sukowaty worked as Associate Medical Director at Dodge Correctional Institution. Id. at ¶2. In that role, Sukowaty supervises physicians and nurse practitioners in her region, establishes operational and medical policies in consultation with prison administrators and provides medical services to incarcerated persons. Dkt. No. 70 at ¶3.

> a. Plaintiff's Medical History and Hernia

The plaintiff has a history of stab and gunshot wounds to his abdomen. Dkt. No. 68 at ¶8. He also has a history of self-harming while incarcerated by swallowing foreign objects. Id. at ¶14. He acknowledged that his self-harming and swallowing of foreign objects led to his medical conditions, including his complaints of abdominal pain. Id. at ¶15. Medical staff advised him not to swallow these objects or he may risk developing a serious injury or death. Id. at

¶16. The plaintiff also acknowledged that he sometimes self-harmed or threatened to self-harm to manipulate staff and change his circumstances. Id. at ¶17.

The plaintiff underwent multiple open-abdominal surgeries to remove the foreign objects that he had swallowed, which led to him developing an irreducible ventral hernia in the lower right quadrant of his abdomen. Id. at ¶¶4, 36; Dkt. No. 70-1 at 6. His hernia was not obstructed and showed no strangulation. Dkt. No. 68 at ¶4. According to Advanced Practice Nurse Prescriber (APNP) Jodi Fields, who is not a defendant, the plaintiff's hernia did not constitute a medical emergency because it did not possess those characteristics. Dkt. No. 71 at ¶¶13–14. She notes that although these types of hernias may be uncomfortable, they generally do not cause the patient pain. Id. at ¶15.

b.      Offsite Consultation and Class III Evaluation

On November 7, 2022, the plaintiff had an offsite appointment with Dr. Karen Reynolds (not a defendant) at Waupun Memorial Hospital regarding his hernia. Dkt. No. 68 at ¶30. Reynolds noted that the plaintiff had a history of surgeries for ingesting foreign objects and one past hernia. Id. at ¶31. The plaintiff reported increasing pain, nausea and constipation but denied fever or vomiting. Id. at ¶32. Reynolds examined the plaintiff and noted that the plaintiff was not in distress, and scans of his abdomen showed no change in the hernia's appearance. Id. at ¶¶33–35. Reynolds explained that the plaintiff's past surgeries for ingested objects had resulted in his hernia and left "very little integrity of his abdominal wall." Id. at ¶36. She determined that "a hernia

repair would be complex, have potential complications, and a high chance for hernia recurrence." Id. at ¶37; Dkt. No. 70-1 at 6. The potential risks included infection, bleeding, bowel injury, failure of the repair and a fifty percent chance of hernia reoccurrence. Dkt. No. 70-1 at 6. She explained the risks if the plaintiff continued to ingest foreign objects after surgery and the recovery he could expect. Id. The plaintiff told Reynolds that he wanted to proceed with the surgery despite the risks and possible complications. Id. Reynolds recommended both that the plaintiff "be scheduled in the near future" for hernia repair and that the prison "[s]chedule for open ventral ASAP." Id. at 1, 6.

Following this recommendation, APNP Fields contacted Sukowaty to ask whether surgery could be ordered or whether it had to be presented to the Class III Committee for evaluation and approval. Dkt. No. 68 at ¶43. Sukowaty explains that the Class III Committee is a group of medical providers within the Department of Corrections (DOC) who evaluate non-urgent or elective surgical recommendations from outside providers. Dkt. No. 72 at ¶7. Class III approval is required for non-urgent, elective medical services (including surgeries) where a delay in treatment will not cause significant or immediate threat to the patient. Id. at ¶¶2–5. Standard hernia repairs are considered elective surgeries unless there are emergency circumstances, including an obstruction or strangulation. Id. at ¶11. Fields determined that the plaintiff's hernia repair surgery was non-urgent because his hernia was stable, and medical staff were addressing the plaintiff's complaints through medication and non-medicinal treatments. Dkt. No. 71 at ¶32. Based on information from the plaintiff's medical history,

Sukowaty instructed Fields to present the procedure to the committee for evaluation. Dkt. No. 68 at ¶¶51–54.

On November 8, 2022, the committee considered the plaintiff's hernia repair surgery. Id. at ¶56. Sukowaty and the other committee members considered the non-emergent nature of the plaintiff's hernia, denied the surgery request and requested additional information about the plaintiff's surgical history. Id. at ¶¶57–59. On November 14, 2022, Fields reported to Sukowaty the plaintiff's "most recent three emergency department visits for foreign body ingestions, as well as his abdominal surgeries since 2020." Dkt. No. 71 at ¶40; Dkt. No. 71-1 at 74. Sukowaty also noted a psychological component to the committee's decision, which involved the plaintiff's persistent use of self-harm and threats to manipulate staff and his circumstances. Dkt. No. 72 at ¶19. She avers that the plaintiff's "behavior did not bode well for his ability to comply with medical advice and post-operative instructions." Id.

Sukowaty further avers that she considered Reynolds's concerns about the integrity of the plaintiff's abdominal wall, the high risk of complications and hernia recurrence and the complex nature of the procedure. Id. at ¶20. She noted the plaintiff's lingering symptoms of nausea, vomiting and constipation, which medical staff were treating with non-surgical interventions. Id. at ¶21. She avers that those symptoms were more likely associated with the plaintiff's gastroesophageal reflux disease (GERD) and his tendency to ingest foreign objects than with his ventral hernia, which typically does not cause pain. Id. at ¶22. Medical staff also provided the plaintiff an abdominal binder, which Sukowaty avers "is the best form [of] treatment for ventral hernias to keep

the individual comfortable and avoid further injury." Id. at ¶23. She says the committee took all these factors into account when considering whether to approve the plaintiff's hernia repair surgery. Id. at ¶24.

Given the plaintiff's medical and psychological history, the committee unanimously decided not to approve the surgical recommendation. Dkt. No. 68 at ¶¶68, 71. Sukowaty avers that approving the procedure "despite knowing [the plaintiff's] tendency to engage in such serious self-injurious behaviors without any evidence that he would refrain from doing so in the future" could be unsafe, unsuccessful and unnecessarily risky to the plaintiff's health. Dkt. No. 72 at ¶26. She and the committee concluded that the surgery was not in the plaintiff's best interests. Id. at ¶27. The committee instead "encouraged" the plaintiff to show "that he could be a proponent in his health by refraining from engaging in the behaviors which were aggravating his abdominal issues, and the surgical recommendation would be revisited in the future." Id. at ¶28.

On November 16, 2022, Sukowaty entered the committee's unanimous decision to deny the request for the surgery repair. Dkt. No. 68 at ¶¶71–72; Dkt. No. 71-1 at 74. She reiterates that although she entered the decision as the chairperson of the committee, the decision not to approve the surgery was not solely hers. Dkt. No. 72 at ¶30. She avers that she did not tell the plaintiff that he had to refrain from self-harm for two years before she would reconsider the surgery. Dkt. No. 70 at ¶38. But she did inform him "that he would have to refrain from ingesting foreign bodies because of the risks associated with that behavior before his surgery recommendation could be considered." Id. at ¶39; Dkt. No. 70-1 at 8.

10

c.  Non-Surgical Treatment

After the committee denied the hernia repair surgery, the plaintiff continued to threaten self-harm if his doctors would not perform the surgery. Dkt. No. 68 at ¶¶77, 82. On November 22, 2022, the plaintiff was sent to the hospital for complaints of abdominal pain and that he was vomiting blood. Id. at ¶83. Hospital staff performed an x-ray of the plaintiff's abdomen, which showed small, metal objects in his abdomen. Id.; Dkt. No. 71-2 at 3. These scans also showed that his hernia remained unchanged. Dkt. No. 68 at ¶84; Dkt. No. 71-2 at 3. Hospital staff determined that the plaintiff "does not appear to need urgent surgery." Dkt. No. 71-2 at 53. Waupun staff continued to provide non-surgical treatment for the plaintiff's other symptoms, including GERD and constipation. Dkt. No. 68 at ¶86.

On December 9, 2022, the plaintiff was seen in the Health Services Unit (HSU) for reports of abdominal pain. Id. at ¶91. He was sent to the hospital the next day, where he underwent surgery to remove two foreign objects in his abdomen. Id. at ¶94. The plaintiff reported to hospital staff "that he had swallowed the objects to get his hernia fixed." Id. at ¶93; Dkt. No. 71-1 at 174. Hospital staff used a scope procedure to remove the items he had ingested. Dkt. No. 68 at ¶112. They informed the plaintiff "that ingesting objects is almost certainly never going to lead to a durable and adequate hernia repair, if anything it only delays formal repair." Dkt. No. 71-1 at 175.

In late November 2022, Dr. Marlena Larson, Psychology Director for the DOC, recommended a multidisciplinary meeting to determine a course of action for the plaintiff because of his stated plan to "do what he feels he needs to in

order for surgery to be completed" and its effect on his mental health. Dkt. No. 68 at ¶¶89–90. On December 12, 2022, Larson hosted the multidisciplinary meeting to discuss the plaintiff's treatment plan. Id. at ¶97. Sukowaty was among the attendees. Id. The attendees early on dismissed the idea of having the plaintiff "be free from self-harm for a period of time to be eligible for surgery." Id. at ¶¶98, 110; Dkt. No. 74 at ¶23. Medical staff reiterated that the surgery was not medically necessary and potentially was more harmful than beneficial, describing the medical risk to the plaintiff as "huge." Dkt. No. 68 at ¶99; Dkt. No. 74 at ¶24. The attendees discussed alternate treatments, including an abdominal binder, a specialty shirt and pain medications. Dkt. No. 68 at ¶101. The attendees did not want surgery to be seen as a "goal" because it could "lead to power struggles" or encourage the plaintiff to continue self-harming to achieve that goal. Id. at ¶¶103–06. The attendees determined that the best course was to refocus the plaintiff on working toward goals other than surgery and to help maintain his safety by diverting his attention toward those goals. Id. at ¶109. Those goals included reducing his pain, rather than believing he could eliminate it with surgery. Id. at ¶111.

On December 16, 2022, following the multidisciplinary meeting, HSU staff requested an abdominal binder for the plaintiff. Id. at ¶113. Fields explains that an abdominal binder improves circulation at the hernia site and can help reduce discomfort caused by the hernia. Dkt. No. 71 at ¶60. Although the plaintiff's medical provider approved the binder, the plaintiff needed approval from the surgical team because he was in restricted housing. Id. at ¶61. But the next day, the plaintiff again was sent to the hospital for reports of

vomiting blood and abdominal pain. Dkt. No. 68 at ¶116; Dkt. No. 71-1 at 9–10. The offsite provider attributed these symptoms to the plaintiff's recent surgery to remove foreign objects, provided him medication and discharged him back to Waupun. Dkt. No. 68 at ¶117; Dkt. No. 71-1 at 162. The plaintiff received the abdominal binder on December 19, 2022. Dkt. No. 68 at ¶118. He also received medications to treat gas and abdominal pain, which Fields reiterates likely were not caused by the plaintiff's hernia. Id. at ¶¶119–20; Dkt. No. 71 at ¶¶66–69. The plaintiff's providers prescribed him medications based on his history of misusing some medications, his allergy to non-steroidal anti-inflammatory drugs and his reported symptoms. Dkt. No. 68 at ¶¶123–24.

On January 22, 2023, the plaintiff again was sent offsite for complaints of vomiting blood and abdominal pain. Id. at ¶125. Hospital staff conducted an x-ray, which returned normal results and showed that his hernia was unchanged. Id. The hospital discharged the plaintiff the next day after determining that his condition was not an emergency. Id.; Dkt. No. 71-1 at 150. Once the plaintiff was back at Waupun, medical staff diagnosed him with chronic GERD, which Fields says could have caused the plaintiff's symptoms and is not associated with a ventral hernia. Dkt. No. 71 at ¶¶76–77.

In February 2023, medical staff documented that the plaintiff had refused some of his medications. Dkt. No. 68 at ¶127. His providers changed his medications in response to his complaints of nausea and vomiting, which Fields reiterates are possible symptoms of GERD or abdominal trauma from the plaintiff's history of ingesting foreign objects. Dkt. No. 71 at ¶¶79–80. The plaintiff again complained of vomiting blood in March 2023, and medical staff

contacted the institution physician for a refill of his anti-nausea medication. Dkt. No. 68 at ¶¶130, 132. Although the plaintiff appeared in distress, HSU staff examined him and found that he had bitten his cheeks to make it appear that he was vomiting blood. Id. at ¶133; Dkt. No. 71-1 at 23–25. Staff provided him Miralax for his complaints of constipation. Dkt. No. 68 at ¶133; Dkt. No. 71-1 at 25. The plaintiff also saw an advanced care provider and underwent an x-ray, which did not show any bowel obstruction. Dkt. No. 68 at ¶134; Dkt. No. 71-1 at 56, 72. He refused further evaluation later that day. Dkt. No. 68 at ¶135.

In April 2023, the HSU saw the plaintiff for reports of "a sharp stabbing pain" after he threatened to self-harm if medical staff did not see him. Id. at ¶¶136–37. But the plaintiff merely told staff that he was "pissed off" and "did not like the texture" of the Miralax he was prescribed. Id. at ¶137; Dkt. No. 71-1 at 56. When the nurse told the plaintiff she did not care if he was pissed off, he "stop[ped] grabbing his stomach, look[ed] up at [her] and sa[id] [']You do not know who I am do you[?]" Dkt. No. 71-1 at 56. He then abandoned his complaints of abdominal pain, and HSU staff changed his prescription from Miralax to milk of magnesia. Dkt. No. 68 at ¶137; Dkt. No. 71-1 at 55.

The next day—April 19, 2023—the plaintiff returned to the HSU after reporting that he had swallowed paperclips, razorblades and other foreign objects. Dkt. No. 68 at ¶138. He was sent to Waupun Memorial, where he again saw Reynolds. Id. at ¶139. Reynolds noted that the plaintiff mostly expressed concern about his hernia. Dkt. No. 71-1 at 113. She performed a procedure to remove the foreign objects but noted that she did not "plan to repair hernia at this time unless absolutely necessary." Id. at 119. Reynolds discharged the

plaintiff back to Waupun with orders for acetaminophen, which prison staff provided him. Dkt. No. 68 at ¶¶139–40. The plaintiff later told psychological staff that he had swallowed the objects to force the hernia surgery and was disappointed that it did not work. Id. at ¶141; Dkt. No. 72-1 at 9.

On May 7, 2023, HSU staff once again saw the plaintiff for complaints of vomiting blood and again noted likely bite marks in his mouth. Dkt. No. 68 at ¶142. When staff told him his vitals were normal, the plaintiff threatened to "do something" to himself so that HSU staff would have to "send [him] out." Id.; Dkt. No. 71-1 at 19. Four days later, the plaintiff returned to Waupun Memorial to see Reynolds for a three-week follow-up from his most recent surgery to remove foreign objects. Dkt. No. 68 at ¶143. She noted that they "had a long discussion regarding his ventral hernia and possible repair." Dkt. No. 71-1 at 78. She recommended that the plaintiff discuss his self-harming with psychological staff to determine if "from a psychological standpoint that he would benefits [*sic*] from a hernia repair"; and if so, she would consider it "reasonable to repair this." Id.

On May 20, 2023, the plaintiff was seen in the HSU for reports that he had swallowed razors, pennies and paperclips and used a razor "to cut out one of the paperclips that had 'gotten stuck.'" Dkt. No. 68 at ¶144. The nurse examining him pointed out that her observations did not match his report, and he ended the conversation. Id. He later told security staff that he was "going on a trip," and he then cut his arm. Id. HSU staff sent the plaintiff to Waupun Memorial, where he did not complain of abdominal pain. Id. On May 22, 2023, the hospital transferred the plaintiff to the University of Wisconsin Hospital for

heightened care. Id. at ¶145. On May 25, 2023, hospital staff performed an exploratory laparotomy to remove the foreign objects he recently had swallowed. Id. at ¶146. During that procedure, they also repaired his ventral hernia. Id.; Dkt. No. 71-1 at 11. Four days later, after the plaintiff returned to Waupun, he threatened to rip out the staples used to close his surgery wound and use them to cut his neck because of a change in his medication. Dkt. No. 73-1 at 5.

In June 2023, following the plaintiff's surgery, he developed an infection at his incision site and had to be hospitalized. Dkt. No. 68 at ¶148. He continued to complain about abdominal pain, nausea and vomiting through November 2023, despite having the hernia repair surgery. Id. He was transferred to the Wisconsin Resource Center in February 2024, where he continued to swallow foreign objects requiring surgery to remove. Id. at ¶149; Dkt. No. 71-2 at 151. Fields avers that the plaintiff's continued self-harm and symptoms after his hernia repair surgery "suggest[] his abdominal trauma and continued foreign body ingestion were the potential causes" of his abdominal pain, rather than being symptoms of the hernia. Dkt. No. 71 at ¶121. In April 2024, the plaintiff was diagnosed with another hernia. Dkt. No. 68 at ¶150.

## II.     Discussion

### A.     Summary Judgment Standard

A party is entitled to summary judgment if she shows that there is no genuine dispute as to any material fact and that she is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the

outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. Brummett v. Sinclair Broad. Grp., Inc., 414 F.3d 686, 692 (7th Cir. 2005).

B. Eighth Amendment

As the court explained in the screening order, the Eighth Amendment governs the plaintiff's claim that the defendant was deliberately indifferent to his serious medical needs. Dkt. No. 9 at 7 (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976); Gabb v. Wexford Health Sources, Inc., 945 F.3d 1027, 1033 (7th Cir. 2019); and Pyles v. Fahim, 771 F.3d 403, 408 (7th Cir. 2014). An Eighth Amendment claim consists of an objective and subjective component. Farmer v. Brennan, 511 U.S. 825, 834 (1994). In the context of the plaintiff's claim against Sukowaty, the objective component requires the plaintiff to show that his medical need constituted a risk of an objectively serious harm. Stewart v. Wexford Health Sources, Inc., 14 F.4th 757, 763 (7th Cir. 2021) (citing Balsewicz v. Pawlyk, 963 F.3d 650, 654 (7th Cir. 2020)). "A medical condition is deemed to be serious if it may be 'life threatening or pose[s] a risk of needless

pain or lingering disability if not treated at once.'" Karraker v. Peters, 65 F.3d 170 at *3 (7th Cir. 1995) (citing Davis v. Jones, 936 F.2d 971, 972 (7th Cir. 1991)).

To satisfy the subjective component, the plaintiff must demonstrate that Sukowaty had a "sufficiently culpable state of mind." Farmer, 511 U.S. at 834. A prison official shows deliberate indifference when she "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015) (citing Farmer, 511 U.S. at 837). "The standard of deliberate indifference 'requires more than negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk.'" Stewart, 14 F.4th at 763 (quoting Huber v. Anderson, 909 F.3d 201, 208 (7th Cir. 2018)).

Because the plaintiff asserts that a medical provider was deliberately indifferent, the subjective component requires him to show that the medical professional's treatment decision was "'so inadequate that it demonstrated an absence of professional judgment.'" Stewart, 14 F.4th at 763 (quoting Johnson v. Dominguez, 5 F.4th 818, 826 (7th Cir. 2021)). Put another way,

> "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances." [Pyles, 771 F.3d at 409] (quoting Sain v. Wood, 512 F.3d 886, 894–95 (7th Cir. 2008)). "To infer deliberate indifference on the basis of a [medical professional's] treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." Norfleet v. Webster, 439 F.3d 392, 396 (7th Cir. 2006).

Id.

The court also explained in the screening order that a prison official's "'delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain.'" Dkt. No. 9 at 7 (quoting Arnett v. Webster, 658 F.3d 742, 753 (7th Cir. 2011); and citing McGowan v. Hulick, 612 F.3d 636, 640 (7th Cir. 2010)). "Whether the length of a delay is tolerable "'depends on the seriousness of the condition and the ease of providing treatment.'"" Id. (quoting Arnett, 658 F.3d at 753) (additional quotation omitted).

C.    Analysis

The undisputed evidence does not support the plaintiff's claim of deliberate indifference against Dr. Sukowaty. The evidence shows that in November 2022, the plaintiff had an irreducible hernia. But contrary to the allegations in his complaint, it is undisputed that his hernia was not obstructed or strangulated. It is undisputed that this type of hernia is not a medical emergency and does not require immediate surgical intervention. The complaint alleges that Dr. Reynolds ordered the prison to immediately perform surgery to repair the plaintiff's hernia. But the undisputed evidence shows otherwise. Reynolds recommended only that the hernia repair surgery "be scheduled in the near future." Dkt. No. 68 at ¶40. Although she additionally wrote that the surgery should be scheduled "ASAP," she noted several concerns about the surgery, including risks of infection, bleeding, bowel injury, failure to repair it and hernia recurrence. The evidence shows that Reynolds's concerns

were well founded, and the plaintiff experienced several of those complications after he eventually underwent hernia repair surgery in May 2023.

That Sukowaty and the Class III Committee disagreed with Reynolds and did not immediately provide the surgery is not evidence of deliberate indifference. See Pyles, 771 F.3d at 409 (citing Johnson, 433 F.3d at 1013) ("Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation."). The evidence shows that Sukowaty was not solely responsible for the decision not to approve the plaintiff's hernia surgery in November 2022. She and several other medical professionals unanimously decided not to approve the surgery based on several factors, including the plaintiff's extensive history of abdominal surgery, the non-emergent nature of his hernia, available non-surgical treatment of his symptoms, the risk of complications and recurrence and the low likelihood that the plaintiff could commit to post-operative recovery given his history of self-harm. The committee concluded that the serious risks of the surgery outweighed the potential benefit to the plaintiff. The committee's thoroughly reasoned medical decision not to approve the plaintiff's surgery despite Reynolds's recommendation is not deliberate indifference. See Zaya v. Sood, 836 F.3d 800, 805 (7th Cir. 2016) ("By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment.").

The undisputed evidence shows that medical staff provided the plaintiff non-surgical interventions for his complaints of abdominal pain and vomiting blood. This included an abdominal binder and medications to treat his pain, gas and constipation. HSU staff repeatedly saw the plaintiff for his complaints and occasionally sent him to the hospital. Scans and x-rays showed that his hernia remained unchanged, unobstructed and non-strangulated. There is no evidence that delaying the surgery unnecessarily prolonged the plaintiff's pain or worsened his condition. APNP Fields explains that the plaintiff's symptoms instead were likely a result of his self-harm, the necessary surgeries to remove items he swallowed and his chronic GERD. Without medical evidence showing that delaying the surgery caused the plaintiff's continued symptoms, there is no basis to hold Sukowaty liable for not immediately approving the surgery in November 2022. See Johnson, 433 F.3d at 1014 (affirming district court's grant of summary judgment for prison physician who denied elective hernia repair surgery in absence of evidence that delay worsened the condition).

Rather than supporting an Eighth Amendment claim against Sukowaty, the undisputed evidence supports the proposition that the plaintiff's continued complaints of abdominal pain and vomiting blood were symptoms of his repeated self-harm or were part of a ruse to obtain the surgery after the Class III Committee denied it. The plaintiff repeatedly told psychological staff that he had swallowed items in a deliberate attempt to receive surgery and was disappointed when his efforts failed. He abandoned his claims of abdominal pain when HSU staff made it clear they would not send him to the hospital. Staff noted more

than once that the plaintiff had bite marks on the insides of his cheeks, suggesting that he was harming himself to make it appear as though he was vomiting blood because of his hernia. Even after the plaintiff had his hernia surgically repaired in May 2023, he continued to complain about abdominal pain and vomiting blood. He also continued to ingest foreign objects or threaten to harm himself when he was dissatisfied with his treatment or his circumstances.

The complaint alleges that Sukowaty used the plaintiff's mental health against him and told him that he needed to go two years without self-harming before she would consider surgery as an option for his hernia. The undisputed evidence does not support these allegations. The evidence instead shows that the Class III Committee considered the plaintiff's mental-health as one of several factors in deciding not to approve his hernia repair surgery. Although Sukowaty did explain to the plaintiff that his self-harm would make future surgery more difficult, there is no evidence that she told him that he "did it to himself" with his self-harming or that he would have to refrain from self-harm for two years before she would reconsider the surgery. The evidence instead shows that during the multidisciplinary meeting that Larson hosted, the attendees (including Sukowaty) dismissed the idea of telling the plaintiff he had to refrain from self-harm for a specific period of time to be eligible for surgery. The evidence shows that Sukowaty never recommended the surgery for the various reasons that she and the Class III Committee considered.

The undisputed evidence would not allow a reasonable jury to find that Sukowaty was aware of but deliberately indifferent to a serious risk to the plaintiff's health from his hernia. Even assuming his hernia was a serious medical condition, the evidence shows that Sukowaty thoroughly considered the risks and benefits of corrective surgery to the plaintiff—a difficult patient with a long history of self-harm and abdominal procedures that rendered the hernia repair surgery more risky than beneficial. That concern proved justified when the plaintiff suffered some of the complications his doctors anticipated, continued to self-harm and continued to complain of the same symptoms even after he underwent surgery and developed another hernia less than a year later. Sukowaty is entitled to judgment as a matter of law, and the court will dismiss this case.[2]

## III.    Conclusion

The court **GRANTS** the defendant's unopposed motion for summary judgment. Dkt. No. 66.

The court **DISMISSES** this case. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by

---

[2] Because the court is granting summary judgment to Sukowaty on the merits, she does not need qualified immunity. Dkt. No. 67 at 18–20. See Sierra-Lopez v. County, Case No. 17-cv-1222, 2019 WL 3501540, at *10 (E.D. Wis. July 31, 2019) (quoting Viero v. Bufano, 925 F. Supp. 1374, 1387 (N.D. Ill. 1996); and Antepenko v. Domrois, Case No. 17-cv-1211, 2018 WL 6065347, at *6 (E.D. Wis. Nov. 20, 2018)) (noting that "[w]here a defendant 'wins on the facts, [she] does not need qualified immunity'").

filing in this court a notice of appeal within **thirty days** of the entry of judgment. <u>See</u> Fed. R. App. Pro. 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. <u>See</u> Fed. R. App. Pro. 4(a)(5)(A).

If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion in *this court.* <u>See</u> Fed. R. App. P. 24(a)(1). The Court of Appeals may assess the plaintiff a "strike" if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. <u>Id.</u>

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **twenty-eight days** of the entry of judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 27th day of December, 2024.

BY THE COURT:

**HON. PAMELA PEPPER**
**Chief United States District Judge**